KEYES FIBRE COMPANY and
Packaging Corporation of
America, Plaintiffs,

v.

UNITED STATES of America,
Defendant,

and

Fripp Fibre Forms Inc.,
Intervenor–Defendant.

Court No. 85–08–01100.

United States Court of
International Trade.

July 22, 1988.

Patton, Boggs & Blow, Frank R. Samolis, Jennifer A. Hillman and Daniel E. Waltz, Washington, D.C., for plaintiffs.

Office of General Counsel, U.S. Intern. Trade Com'n, Lyn M. Schlitt, James A. Toupin and George W. Thompson, Washington, D.C., for defendant.

Dorsey & Whitney, Bruce Aitken and Edward R. Easton, Washington, D.C., for intervenor-defendant.

## MEMORANDUM & ORDER

AQUILINO, Judge:

The U.S. International Trade Commission has issued the results of its reconsideration of whether the molded-pulp egg-filler-flat industry in the United States is materially injured by reason of imports of like merchandise from Canada. That reconsideration was carried out pursuant to an order of this court in conjunction with slip op. 88–31, 12 CIT ——, 682 F.Supp. 583 (1988), and has resulted in a renewed negative determination of causation of material injury by the imports which are sold at less than fair value.

In addition to the redetermination, the defendant has interposed a motion for leave to file a motion for rehearing out of time, which is supported by the intervenor-defendant.

### I

 CIT Rule 59 mandates that motions be made within 30 days of an order for which rehearing is sought. This requirement has not been met here by the defendant, which attributes the tardiness of its motion to the time required to review on remand the facts in the record. However,

the motion seeks rehearing on a point of law—one already considered and discussed in slip op. 88–31 in the light of *British Steel Corporation v. United States*, 8 CIT at 86, 593 F.Supp. 405 (1984). *See* 12 CIT at ——, 682 F.Supp. at 589. The motion refers to *Copperweld Corp. v. United States*, 12 CIT ——, ——, 682 F.Supp. 552, 567 (1988), which also relies on *British Steel's* interpretation of the price-undercutting provision of 19 U.S.C. § 1677(7)(C)(ii). While the timing and nature of that recent reliance are not sufficient ground to grant defendant's motion for rehearing, in hereby denying the motion the court notes in passing that the *Copperweld* opinion emphasizes in regard to the imports from Canada at issue therein that

> the information obtained by the ITC was specifically designed to ·eliminate the differences in transportation costs. The instructions to the pricing section of the questionnaires utilized by the ITC explicitly provided that "[p]rices must represent arm's length transactions ... and *should exclude the cost of freight to your customers.*" *Id.*

Defendant's motion for rehearing points out clearly, however, the nature of the Commission's misinterpretation of the court's remand order herein, to wit:

> ... [I]mported egg filler flats are not delivered to cooperatives, but are shipped directly to end users. The cost of such delivery is reflected in the actual price that the Canadian producer charges the cooperatives.... [B]ecause cooperatives never take possession of the imported egg filler flats there is *no possibility* that actual Canada-to-cooperative transportation costs could *ever* be determined. The Commission believes that such an artificial calculation does not, in this case, provide a proper basis for assessing real conditions of competition in the marketplace.[1]

The court concurs—and did not require otherwise of the ITC on remand.

Nevertheless, as stated at page 2 of defendant's reply memorandum, the "Commission adjusted the delivery costs for the imported product to reflect hypothetical deliveries to cooperatives, rather than directly to end users." As explained further in that memorandum, the ITC had obtained actual freight costs for delivery of the imports to the customers of the cooperatives in the various states. On remand, the Commission measured the mileage from Fripp's Canadian plant to the nearest and the farthest points in those states[2] and divided the actual freight costs by the mileages to obtain a maximum and a minimum cost of transportation per mile. Actual distances from Fripp to the respective cooperatives were determined and multiplied by the costs per mile to provide maximum and minimum costs for freight to the cooperatives. Those costs were either added to or subtracted from the cooperatives' prices, depending upon whether their distances from Fripp were greater or less than the distances to the end-users. The Commission then compared those prices with domestic prices to determine whether significant price undercutting had occurred and concluded:

> The adjusted import prices show some instances of underselling by the imports. In fact, the adjusted import prices in many other instances were higher than the prices that we relied upon in our final determination. Overall, there was no significant underselling by the Canadian producer at the distributor-cooperative level.
>
> In sum, the absence of significant underselling by imports at the distributor-cooperative level of distribution, considered with the other reasons specified in our final determination, indicate the absence of a causal connection between the condition of the U.S. industry and the LTFV imports from Canada.[3]

---

1. Defendant's Motion for Rehearing, pp. 5–6 (emphasis in original).

2. This approach was taken due to the record's lack of the exact localities of the end-users.

3. Remand Results at 5–6 (footnotes omitted). Commissioners Liebeler and Brunsdale have submitted additional views. Commissioner Rohr has submitted concurring views.

## II

█ In slip op. 88–31, this court affirmed the Commission's choice of the distributor/cooperative level at which to analyze the question of causation of the material injury as being within the parameters of its broad discretion. The remand order left that discretion unrestrained; the Commissioners were free to reconsider the controlling question at the same level or at another point, *e.g.,* the end-user level, analysis of which had led to the preliminary affirmative determination of material injury by reason of the imports in question. The plaintiffs continue to press this point as a proper alternative.

Plaintiffs' preference notwithstanding, the Commission has again considered causation at the distributor/cooperative level, but without an appropriate attempt to rectify the defect in its original analysis, namely, "comparison of prices entailing freight to two different points in the channels of distribution of the merchandise." 12 CIT at ——, 682 F.Supp. at 589. As also stated in slip op. 88–31, "the freight factor for the Fripp filler-flats does not require anything more than correlation to that point in the channel of distribution of the domestic merchandise at which the Commission compared prices." *Id.* This did not mean measuring mileages from Fripp to the cooperatives, which are not directly in the channel of distribution of the imports, rather measuring mileages from Fripp to the distributors of domestic filler-flats in the various states and then computing freight costs to their locations based on the mileages thereto multiplied by the per-mile rate(s) for the imports.[4] Stated another way, determine which domestic distributor is nearest in distance to (or has otherwise dealt with) each end-user of the imported filler-flats, determine the distance from Fripp to that distributor[5], and multiply that distance, as the extent of the freight for those particular imports, by their per-mile rate.

Once that freight has been computed as indicated, the Commission will be in a position to more properly consider whether there has been significant price undercutting by the imported merchandise as compared with the prices of the like product of the United States by adjusting the import prices for the constant—freight—beyond the point of distribution of the domestic product. Such adjustment remains necessary as long as the ITC, in the exercise of its discretion, continues comparison at that point to fulfill its obligations under 19 U.S.C. § 1677(7)(C)(ii). Hence, this matter is hereby remanded to the Commission for further proceedings not inconsistent with this memorandum. The defendant shall file within 45 days hereof any redetermination of the issue of whether the molded-pulp egg-filler-flat industry in the United States is materially injured by reason of imports of like merchandise from Canada. The plaintiffs may have 15 days thereafter in which to respond[6], and the defendant and the intervenor-defendant may have ten days to reply thereto.

So ordered.

█

---

4. To the extent that per-mile rate(s) for the imports have already been determined (on the present record as described in Point I *supra*), the Commission can use them again—or it is free to reopen the record for additional information, but it is not required to do so, as the plaintiffs argue.

5. In fact, the record reflects some sales of Fripp filler-flats to domestic distributors in each of the regions of this country. *See, e.g.,* Confidential Document 18.010 (Canadian Producer's Questionnaire, pp. 9–12 (May 17, 1985)).

6. While the relief granted herein obviates the court's ruling on plaintiffs' objections in their present Response to ITC's Remand Decision, other than as indicated in this memorandum, suffice it to state now that the methodology followed by the Commission should be clear enough in the public record so that any demand for production of allegedly privileged legal analysis like that contained in plaintiffs' present footnote 7 will not be necessary. *Compare id.* at 5, n. 7 *with USX Corporation v. United States,* 11 CIT ——, 664 F.Supp. 519 (1987).